We'll hear argument next today in Case No. 15-8049, Buck v. Davis. Ms. Swarns. Mr. Chief Justice, and may it please the Court, Dwayne Buck was condemned to death after his own court-appointed trial attorneys knowingly introduced an expert opinion that he was more likely to commit criminal acts of violence in the future because he is black. This evidence encouraged the sentencing to do – sentencing jury to make its critical future dangerousness decision, which was a prerequisite for a death sentence and the central disputed issue at sentencing based not on the individual facts and circumstances of Mr. Buck's crime or his life history, but instead based on a false and pernicious group-based stereotype. Didn't that expert say, I don't think he's a future – I don't think he's going to be a future danger? On cross-examination, Dr. Kihano testified that he did believe that Mr. Buck was likely to commit future crimes of violence. He said that at the prosecutor's questioning that Mr. Buck was on the low end of the continuum, but that he could not say that Mr. Buck was not likely to commit criminal acts of violence. But Mr. Buck was unquestionably – But more likely than not that he wouldn't. Yes. He was on the low end of the – the spectrum in terms of the risk of violence. But here, this expert's evidence not only prejudiced Mr. Buck at sentencing, it also put the very integrity of the courts in jeopardy. For that reason, Texas acknowledged that its ordinary interest in finality does not apply. It publicly declared that it would waive its procedural defenses and allow new sentencing hearings in six capital cases, including Mr. Buck's, that involved the same expert's race-as-criminal-violence opinion. Texas conceded error in five cases and then reversed course in Mr. Buck's case alone. As a result, Mr. Buck is the only Texas prisoner to face execution pursuant to a death sentence that Texas itself has acknowledged is compromised by racial bias that undermines confidence in the criminal justice system. There's a tension in your briefing over what you're really arguing for. In the question presented, you focus on the Fifth Circuit standard for a COA and saying they're imposing an improper and unduly burdensome. But most of the briefing, and as you've sort of begun today, is really focused on the underlying merits of the And you sort of have to make a choice, don't you? Because if we look to focus on the merits and rule in your favor, well, then we don't get to say too much about the threshold for certificate of appealability. Well, if we focus on the certificate of appealability, all we're saying on the merits is that there's a substantial showing. So what do you want us to do, on the merits or on the certificate of appealability? Well, in order to determine whether Mr. Buck was required to be entitled to a certificate of appealability, this Court and the Fifth Circuit was required to determine whether or not the district court's decision with respect to both the constitutional question and the procedural question would be debatable among jurists. Right. Right. So is that what you want us to say, that because the merits are debatable, he should have gotten a certificate of appealability? Or do you want us to say, well, he was he should have won, and so he obviously should have gotten a certificate of appealability? We believe that the district court's decision is wrong, and therefore, Mr. Buck was entitled to a certificate of appealability. Okay. So on the merits, you just – on the merits, then, you just want us to say, oh, there's a reasonable jurist could disagree about whether or not he was unconstitutionally sentenced. Or that the just that reasonable jurist would conclude that the district court's decision that Mr. Buck was not prejudiced was incorrect, and therefore, Mr. Buck was entitled to a certificate of appealability. But for example, I mean, last year in a case called Welch, the question came up on a certificate of appealability, and we just said, well, of course, he should have gotten a certificate of appealability because he's right. And similarly, we did the same thing, oddly enough, in one of the cases at issue here. We did the same thing in Trevino. Yes, he should have gotten a certificate of appealability because he has the merits on his side. That's essentially what you would want us to do? Yes. I mean, that does leave on the table, maybe this is what the Chief Justice was saying, this question of whether the Fifth Circuit is just using the wrong approach and the wrong standards for the certificate of appealability question. Well, in this case, the Fifth Circuit's analysis completely ignored the heart of the case in making its certificate of appealability determination, right? The center of Mr. Buck's claim has always been the introduction of racial discrimination that undermines the confidence in not only his own death sentence, but the integrity of the courts as well. In assessing the debatability of the district court's decision, the Fifth Circuit doesn't engage at all around the central question here about the critical role of race in Mr. Buck's case, in his sentence, in the integrity of the courts, and ultimately in what Texas did in terms of acknowledging the absence of finality in his case. So the Fifth Circuit's conduct in conducting the certificate of appealability analysis, you know, ignored critical facts in this case, and that's why we're here. Sotomayor, the two dissenters in this case argued that the Court had improperly denied ACOA. And that was their basic position. They didn't really engage the merits. They just engaged the standard of issuance of ACOA. We go back to that. Are you satisfied if we say they used the wrong standard for denying the ACOA, or will you only be satisfied if we say you win? I think that the Fifth Circuit, you know, obviously I would like for this Court to say we win and Mr. Buck is entitled to a new fair sentencing hearing. That would obviously be my preference. I think in the posture of this case, this Court can and should say that Mr. Buck is entitled to a certificate of appealability because all of the explanations and justifications that were presented by Texas and the district court are incorrect and unsustainable. Sotomayor, let's start with the COA issue. With respect to the COA issue, I read your adversaries, your to say, Martinez-Trevino could never constitute an exceptional circumstance to justify the issuance of ACOA. I think basically that's their position, because they weren't made retroactive. So first, what does the retroactivity argument have to do with anything? All right? What does it apply to? And aren't you making Martinez and Entrevino retroactive if we recognize it as an exceptional reason to forgive a procedural default? And then second, there is a circuit split on this question, and you recognize it in your brief. You have the Third Circuit using a three-part test that says Martinez and Trevino under certain circumstances can be a reason to find exceptional circumstance. The Ninth Circuit has a six- or seven- or eight-part test. They never make it simple. And the Fifth says never. Where do you stand on all these tests? And what's your position with respect to this retroactivity question? Well, with respect to retroactivity, T governs new rules of constitutional law that apply at the trial stage. This is just a rule that doesn't has no applicability. It squarely arises only in the habeas context. So Teague just doesn't apply to Martinez and Trevino. With respect to its applicability to Mr. Buck and to Mr. Buck, this is a circumstance where if the 60B was properly granted, Mr. Buck would be back in the same exact position as were the Petitioners in Martinez and Trevino. He would be arguing a seeking cause to excuse the default of his trial counsel ineffectiveness claim in a first petition for habeas corpus relief. Alito, this is a very unusual case, and what occurred at the penalty phase of this trial is indefensible. But what concerns me is what the implications of your argument would be for all of the other prisoners who, let's say, they're not even capital cases, but they have they want now to raise some kind of ineffective assistance of counsel claim that is procedurally defaulted, and they say we should have relief from a prior judgment, denying habeas relief. And now, what would prevent a ruling in your favor in this case from opening the door to the litigation of all of those issues so that those Martinez and Trevino would effectively be retroactive? Well, I think there are three factors, I think, that makes Mr. Buck's case unique. First and foremost, it involves an express appeal to racial bias that not only undermined the integrity of his own death sentence, it undermined the integrity of the court's. Second, he now faces execution. This is a death penalty case. He now faces execution pursuant to that death sentence that is unquestionably and I will agree with you, indefensible and compromised by racial bias. Third, there's no question of Mr. Buck's diligence here. Mr. Buck has consistently and unrelentingly, you know, pursued relief on his claims. So I think that those factors make Mr. Buck's case unique from the vast majority of prisoners. That's the Third Circuit test, isn't it? It is. And that makes Mr. Buck unique from the vast majority of noncapital or other prisoners who are going to bring these cases to the Federal courts. So the answer to Justice Alito is that, in our opinion, we should say our interpretation of Rule 60B, in case it doesn't apply unless it's a capital case? I mean, 60B doesn't draw that distinction. No. I think in terms of the question of the extraordinariness factors, I think this question of the court can and should look to those that we've identified in our brief. First, is there a risk of injustice to the Petitioner? Here, we unquestionably have that. We're facing an execution for a case of unjustice. Well, the risk of injustice, if it was a sentence for 10 years, that's unjust. Absolutely. So there are more. Okay. So that doesn't work. What else? There are more. The risk of injustice in impairing the integrity of the judicial system more broadly. The State's ---- I guess the same answer there. If he's sentenced to 40 years, you know, that impairs the integrity of the system. I mean, I know that, obviously, death is different. Right. But it's hard to factor in why it's different in the context of interpreting particular rules. You know, I would say additionally, though, here, Your Honor, particularly unique to Mr. Buck's case is where we have the State acknowledging that it has no significant finality interest in Mr. Buck's death sentence. And when you add to that the fact that Mr. Buck's claim of ineffective assistance of counsel is, you know, to be mildly meritorious, you know, you have a group of factors which I think can ---- this Court should provide guidance around the question. Well, the State did change its mind with respect to Mr. Buck's case, and I assume they'll tell us that there's a reason for that. It's not just because his defense counsel introduced it, because that was true in some other cases as well. But if we rely on that too much, won't this discourage prosecutors from offering discretionary concessions? You know, this is a unique circumstance. I think that I don't believe it would discourage prosecutors, because Texas doesn't actually disagree with and cannot disagree with the fundamental problem in this case, which is that it is compromised by racial bias that undermines the integrity of the courts. Texas has certainly taken a different position about what it should do about it, but it cannot get away from those core facts that establish that, like, no State has an interest in a death sentence that is undermined by racial bias. To the extent it is a unique case, it really doesn't provide a basis for us to say anything at all about how the Fifth Circuit approaches certificates of appealability, does it? It's a unique case, so this would be an odd platform to issue general rules. But in the brief, you say, well, the Fifth Circuit grants these in a very small percentage of cases. The other circuits are much higher. But if it is so unique, I don't know how we can use it to articulate general rules. Well, it's certainly an extraordinary case. And I think that because it is so extraordinary and because the lower courts failed to, you know, acknowledge that and reach that conclusion, that this case sort of underscores the deep need for guidance to the lower courts on the evaluation and assessment and what factors should be considered in determining when 60B is or is not appropriate. Robertson, was it wrong? Was it wrong for the court of appeals to conduct a merits inquiry in this case? I mean, they went to considerable length in trying to determine whether or not, you know, the claims were valid. Was that an error? Should they have just said, well, you know, the test is, what, substantial, showing a substantial, a substantial showing of denial. They should have just done, you know, kind of a sort of quick and dirty peek at the merits and saying, yeah, there might be something there. So did they err in looking at it more closely? Certainly. This Court has made clear time and again that the COA analysis is a threshold review of the merits. So should our decision be just that? They erred in looking at the merits. They should have just issued a certificate of appealability and sent it back? That's not what you wanted. No. No, it's not. Again, I believe that this Court, because we do have the Fifth Circuit and the district court going past the threshold analysis and speaking substantively to the merits, this Court can and should explain that those reasons that have been offered by those courts are incorrect. And under the COA standard, if this court at the COA should issue if the district court's decision was debatable or wrong. No, but it seems to me you're well beyond the COA should issue. You don't want us to say that. You want us to say that there's been a constitutional violation in this case and the court of appeals was wrong in determining that there wasn't. I would like for this Court to say that there was a constitutional violation in this case. And, Ms. Warnes, I would have thought that your answer would be that, you know, you think that this is so — such an extraordinary case and that the Fifth Circuit got this so wrong that it's the best proof that there is that the court is — is approaching the COA inquiry in the wrong way. Right. If they reached the wrong result in this case, it's because they're just not understanding what the COA inquiry is all about. Right. I mean, I agree. Absolutely. I mean, this — the fact that this Court found — was unable to find these facts and circumstances debatable shows the — the fact that the Fifth Circuit is applying the standard incorrectly, for sure. And it goes also to the need for guidance, right, to the Fifth Circuit, not only on the COA point, but again, on the 60B point, because there really is a substantial lack of information available to the lower courts with respect to the evaluation of what is or is not extraordinary. Roberts So what is the test you — should we say the Fifth Circuit should apply in considering whether to issue certificates of appealability? Do you have anything to add to the statutory language? You know, I don't think — I don't have additional language. I think this Court has made quite clear that it's a threshold application.  has noted in previous decisions that the Fifth Circuit has not scrupulously adhered to the application of the COA standard. And the data that we provided to this Court sort of amplifies and demonstrates that fact. So I think that what you can do is use this Court, again, as an example of how far the Fifth Circuit is out of line from the proper application of the COA standard under these circumstances. Alitoson Would it be possible to defend what the Fifth Circuit did based on the prejudice prong of Strickland? There was a lot of evidence, both relating to the offense that was committed and to other conduct by Petitioner that would show future dangerousness. It didn't have to rest exclusively on this bizarre expert testimony. Isn't that correct? There is certainly — Texas certainly presented evidence of future dangerousness in this case. I think that, however, the heart of those — that evidence was sort of the facts and circumstances of the instant crime, Mr. Buck's lack of remorse immediately after he was arrested for the instant crime, and the domestic violence incidents in the prior offenses. This Court has recognized that aggravated crimes like this, like exactly like the kind we are talking about here, can and do trigger a racialized fear of violence that can yield arbitrary death-sentencing decisions. That was your holding in Turner v. Murray. So the fact that we do face a case that does have very aggravated facts sort of compounds the risk of prejudice to Mr. Buck. And what we have here is a circumstance where not only do the terrible facts of the death-sentencing decision, you have the experts stepping in and compounding that risk and putting it — putting an expert scientific validity to this pernicious idea that Mr. Buck would be more likely to commit criminal acts of violence because he's black. So the risk in Mr. Buck's case is doubled, essentially, in light of — in light of those facts, in light of the aggravating evidence here, and how Dr. Quijano's opinion compounded some of those risks of violence. Sotomayor, I know that there's been a lot of talk about how small the reference to race was with respect to the questioning at trial on both sides, but how much was it a part of the actual report? Because that's what the jury asked for. And they asked for two things. Could they consider life without parole? So they were obviously considering mercy. Somebody was. Correct. I don't know if all of them, but someone wanted to talk about it. That's what they told the judge. Can we talk about life without — life without parole? I don't even know what the answer to that was. I should have checked that. But if you do, you can tell me. Yes. But number two, they asked for the psychiatric report. That's correct. Does that — not to have the testimony reread, but for the report. So tell me what — how that changes the calculus, those two things in any way. Sure. So first, the issue of life without parole was negotiated in the trial proceedings. It was absolutely — they were not given any information about the feasibility of parole in this case. But as Your Honor correctly observed — They were told that he would be eligible for parole after, what was it, 40 years? No, they were not. They were not told anything? No, they were not. They were not given information. In fact, the trial prosecutor fought very hard to make sure that this jury did not receive the information about parole eligibility. It was one of the issues that she was very concerned about making sure was redacted from Dr. Quijano's report, because he, in his report, had a reference to the 45-year parole. How old was Mr. Buck? How old was Mr. Buck at the time? I think he was in his 20s. I am not sure at this moment. So we do know that the jury was considering the possibility of a life sentence. And then we have them asking for the psychiatric report, which contains a sentence that says that Mr. Buck is, in fact, more likely to commit criminal acts of violence because he's black. That evidence, of course, once you have that report, after the jury had heard it on direct and cross-examination from the witness stand. So ultimately, we have a situation where the jury is literally making the decision about Mr. Buck's life and death — making the future dangerous decision while they have this imprint in their hands. And we also know this is a jury that was not able to make a quick decision on sentence. You know, notwithstanding Texas's claims that its case in future dangerousness was overwhelming, this jury didn't make a quick decision as you would have expected to see if the case was, in fact, overwhelming. This jury was out for two days on the questions that it was presented with. And so what this shows is at — during this pivotal time when it was obviously struggling to determine an answer to the question of whether or not Mr. Buck was or was not a likely danger, it had in its hands a piece of paper that validated evidence that came from both sides of the aisle in this case, right? When the defense has a — Sotomayor, do you know what the composition of the jury was in this case? It's not in the record, Your Honor. Our research that we have — the only thing we've been able to confirm on our own is that ten of the jurors were white. I don't know what the race of the other two, and it's certainly not in the record. But ultimately, I don't think it matters what the race of the jury is. This is evidence of an explicit appeal to racial bias. This is the kind of evidence that courts for over a hundred years have said once it is introduced, even just once, it's impossible to unring the bell. And this is because this evidence in this case spoke to the pivotal question of whether or not Mr. Buck would be executed. The future dangerousness question in Texas was the prerequisite for a death sentence. If this jury did not find a future dangerousness, then Mr. Buck couldn't be executed. This evidence put the thumb heavily on the — on the death scale, and particularly as it fit into the evidence in this case. As I said, Texas presented three categories of evidence, the crime, the lack of remorse, and the prior domestic violence. But nothing that Texas presented spoke to the question of whether or not Mr. Buck was likely to commit criminal acts of violence if he was, in fact, sentenced to life in prison. They just didn't present any evidence on that subject. Mr. Buck, on the other hand, presented Dr. Lawrence. And Dr. Lawrence spoke, you know, powerfully to the question of whether Mr. Buck was likely to commit criminal acts of violence if he were in prison, which was the only alternative to a death sentence that the jury was presented with. Dr. Lawrence — Alitono, you said that the evidence of his dangerousness was limited to those with whom he had a romantic relationship, but he killed at least two people with whom he didn't have a — he killed two people with whom he did not have a romantic relationship. Isn't that right? No, he killed — His stepsister? No. She survived. I'm sorry. All right. Well, she shot her. Yes, exactly. And this is all clearly in the context — absolutely, he did. There's no question about the fact that he shot his — his sister. And — but all of that was in this one sequence of events where it arises out of the breakdown of his relationship with his ex-girlfriend. And again, however, Dr. Lawrence presents evidence that — that the record is that Mr. Buck has a positive institutional adjustment history, that when he was previously incarcerated, he was held in minimum security, and that all of the crimes of violence that took place in the Texas Department of Corrections in the prior year were committed by people who were gang-involved, and there was no gang involvement here. So Dr. Lawrence's testimony highlights the shortcomings or the limitations in Texas's case for future dangerousness, right? They say, here we do have evidence that — that goes beyond what Texas has presented. And what fills the gap for Texas, the only evidence that Texas has that says he will be dangerous in that context, is Dr. Quijano's evidence that he has an immutable characteristics which establishes that he will be dangerous no matter where he is. And I would like to reserve the remainder of my time for rebuttal. Roberts. Thank you, counsel. Mr. Keller. Keller. Thank you, Mr. Chief Justice, and may it please the Court. We are here today defending the death sentence because Petitioner murdered a mother in front of her children. He put a gun to the chest of his stepsister and shot her, and he murdered another man. Roberts. I assume the facts — I assume the facts in the other Saldano cases are similarly heinous, the ones where the State determined that another — nonetheless, that there was a risk that they would be sentenced to death because of their race. And I don't understand — I understand the procedural differences in this case, but I don't understand why that ultimate conclusion doesn't apply here as well. In other words, regardless of whether the evidence was admitted by the prosecution or by the defense, it would seem to me that the same concern would be present. Keller. There's a key distinction between when a government, a prosecuting authority, is introducing evidence of racist dangerousness. That would be the equivalent of using race as an aggravator. When the defense injects race, although we do not defend defense counsel's actions in injecting race into the proceeding, but when — Kennedy. The prosecutor revisited it, Mr. Keller, in cross-examination. To put that into context, the prosecutor did not go beyond the scope of direct. The prosecutor saw the expert report for the first time that day and had just reviewed it over the lunch hour. This is at JA-154A and 165A. And the prosecutor is walking through all the various factors that Quijano had considered in his testimony. But it did not go beyond what was elicited on direct. And to highlight an example in contrast, the Alba case in which we did confess error, there the prosecutor mentioned race four times and at closing said, quote, and I went down all the indicators. They didn't want to talk about those indicators, but I did. And I forced the issue. He's male. He's Hispanic, et cetera. That's at Volume 28 in the Trial Transcript 641. Ginsburg, that Petitioner's own counsel introduces, show how abysmal his representation was, I don't know why it should make a difference that the Petitioner's counsel introduced this evidence. This evidence, everyone reads, should not have come in. And what counsel would put that kind of evidence before a jury? What competent counsel would put that evidence before a jury? And we are not defending defense counsel's actions, but the nature of that claim is a Sixth Amendment ineffective assistance claim that the court also reviews for prejudice. In the context of a prosecutor offering the testimony and using it as an aggravator, that would be an equal protection and due process violation. And the nature of the evidence coming in in that instance would be significantly highly prejudicial when the State is putting its imprimatur behind it and using it as an aggravator.  and due process violation. Sotomayor, why does it matter who uses race? I mean, in Batson challenges, we don't care if the person exercising a racial challenge is the prosecutor or the defense attorney. We say neither should use race in a negative way against a defendant. So why is it different here? Why is it okay or not okay for the prosecutor to introduce the greater likelihood of a person being dangerous on the basis of race alone? Not okay for the prosecutor, but it's less bad for the defense attorney to do it. Well, yeah. To be clear, it's not okay. The issue, though, goes to the level of prejudice. And when defense counsels do it, it's not okay. Well, the level of prejudice is the reasonable possibility that at one juror, because Texas is, if one juror doesn't agree with death, death is not imposed, correct? Correct. So if one — is it a reasonable possibility that one juror, even the one who sent the note that says, is it possible to do parole, life without parole, could have been convinced to exercise mercy if race wasn't used? Can you answer that question? Absolutely not. We had a time when, in at least one of the Saldano cases, a man poured gasoline on a woman and watched her die. We had a nation that was mortified, shocked, and completely traumatized by watching a pilot burn to death. So why is that crime any less heinous than this one? Here, Petitioner executed a mother when she was on her knees in front of her children with her daughter jumping on the ground. I don't say it's not. But why is that heinousness so much greater that no jury could have exercised mercy? No juror. The standard in the Strickland second-prong prejudice analysis is whether there's a substantial likelihood of a different outcome. As Wong v. Belmonte has noted, the State doesn't have to rule out the death sentence. Sotomayor, reasonable probability is the actual language, not substantial. Harrington v. Richter said, quote, the likelihood of a different result must be substantial, not just conceivable. It's 562 U.S. at 111. And if I can address the jury deliberation point for a moment. Petitioner is correct. The jury deliberated over the course of two days, but this is only for three hours and 13 minutes. This is a record 1918 to 1919. On the first day, the jury asked for the police reports and the psychology reports. On the second day, the jury asked to see the crime scene video. This is JA210A, record 5956 and record 6333. So insofar as the Court were to look at the circumstances of the jury's deliberations and I'm not sure that that is necessary for the Court to do, but the inference to be drawn is in those final 95 minutes before the jury returned a verdict to future dangerousness. It was looking at the crime scene video. Robertson, I'm not sure how the quickness of the determination helps you at all. I mean, one response would be, well, they had this evidence that he was, by virtue of his race, likely to be dangerous, so they didn't spend that much time on it. And the argument here is that under these circumstances, when they were focused on the crime scene video, that that would have been what the jury was going to do. Breyer, we're not in the jury room. We do know that the prosecutor asked the expert witness. Is it correct that the race factor, black, increases the future dangerousness for various complicated reasons? And he says yes. So that seems — I mean, you can't prove it, that that was the key factor, but it seems like it could have been a substantial factor. And Texas, in six cases, says this is totally wrong. And now in this seventh case, you're taking the opposite position. And I have to admit, like what the Chief Justice seemed, I don't understand the reason. It seems to me it proves the arbitrariness of what's going on. But regardless, the issue here is, is there some good reason why this person shouldn't have been able to reopen his case? I mean, that's the question. What's the reason? I mean, after all, we later decided these other cases, Martinez. His circumstances seem to fit Martinez pretty much like a glove. The State certainly doesn't have a strong interest any more than in the other cases, or at least not obvious to me, some kind of reliance. So he has a case where Martinez seems to apply. He couldn't. He was — he was diligent. Diligent. Not much to — not much reliance on the other side. And seems to meet Martinez's criteria for hearing the issue. If that — why doesn't that make it extraordinary enough to reopen under Rule 60B? That, it seems to me, the question in the case. For two reasons, and both are controlled by Gonzales v. Crosby. The first is that the only changed circumstance in this case since 2006 is the Martinez and Trevino change in the law. And the second is there was a lack of diligence in pursuing this claim. An ineffective assistance claim was raised on Federal habeas in the district court. A COA was not asked for on that claim. And the ineffective assistance claim also was not even raised in the first 60B motion. Breyer. And all this took place after this Court decided Martinez and Trevino? In the context of the second 60B motion. But that was — I mean, you listed a whole bunch of things in which he could have done. Did those take place or not after we decided our case? If some of them did, which? The Federal habeas petition and asking for a COA in the first 60B motion were before Martinez and Trevino. But in Gonzales v. Crosby, the Court noted that there, the Petitioner was not pursuing the claim with diligence even before the change in the law, and the Court said a change in the law. But he did exactly what you would have expected him to do. Given that Coleman was still on the books, you would have said it would be — have been improper for him to ask for the relief that you are now suggesting that he should have asked for. At least it would have been futile with Coleman still on the books. Well, although the same would have been said under existing precedent in Gonzales v. Crosby, there that the statute of limitations would have run. And so there also be — Isn't this substantially different than Gonzales? Wasn't it important in Gonzales that the nature — what the nature of the error was? In Gonzales, what the Court said, the error is commonplace. People — lawyers misjudge time limits all the time. The one thing we know about this error is that it's not commonplace. Even the two people who called the Catano as defense witnesses never themselves raised race as a cause — as a reason for future judgment. Sotomayor, this is a case of dangerousness. Only this attorney, who's been disciplined repeatedly for his malfeasance in representing clients, who one newspaper said, if you want to ensure a death penalty, hire this lawyer. In that situation, isn't this that rare case that Gonzales talked about? This is certainly an unusual case. And the standard for extraordinary circumstances in this posture, though, is not simply would an appellate judge in the first instance conclude that, but that the district court abused its discretion in declining to find extraordinary circumstances when Gonzales v. Crosby is on the books. Breyer, to my understanding, involved a change in the AEDPA statute of limitations. Is that right? Correct. As soon as I say those words, I'm confused. I mean, there are all kinds of statutes of limitations, and this was one of them. What the Court said, he didn't — he didn't pursue the change diligently, and besides, it wasn't that big a deal, and not every interpretation of Federal statute setting habeas requirements provides cause for reopening. A case is long since final, and the change was not extraordinary, and it was because of a significant part of Petitioner's lack of diligence in pursuing it. So they have a whole list of reasons there. And as I read those reasons, I don't think one of them applies here. So which one applies here? Well, insofar as the extraordinary circumstances analysis under 60B is being performed, I believe the Fifth Circuit was correct in that it would have to be an extraordinary circumstance justifying relief from the judgment. And when the facts of this case obviously have existed for over 20 years, there would be nothing new about raising that claim in a second rule 60B motion to reopen the judgment. And so in that sense, this is even further than Gonzales v. Crosby, where that was just a 60B motion. This is the second 60B motion. Roberts. I understand your arguments on the merits, but do they apply equally to the certificate of appealability? I mean, you argue that you should prevail on the merits. But the question on a certificate of appealability is whether there has been a substantial showing of denial of a constitutional right. Assuming you haven't already seen the analysis on the merits, and you're looking at this question for the first time before going through this analysis, wouldn't it seem pretty straightforward to say, okay, maybe he's right, maybe he's wrong, but at least he's made a substantial showing. Let's give him a certificate of appealability, and then we'll go through the normal procedures on the merits. It's clearly a harder standard for us under the certificate of appealability standard. But even then, you'd be asking, would reasonable jurists debate whether the district court abused its discretion in declining to find extraordinary circumstances? Roberts. Well, that gets tougher and tougher. When you're talking about reasonable jurists debate, okay, that's a very low threshold. But when you say reasonable jurists debate whether there's been an abuse of discretion, I mean, abuse of discretion gives a broad range to the district court. And now you're asking, well, is there a reasonable person out there who could debate that you ought to have deferred to that exercise of discretion? It seems to me, yes, it's a different standard, but it's quite a different standard. And the broader question here is whether the Fifth Circuit applies the wrong standard on a certificate of appealability. And it seems to me that if you're going to say, particularly when you're reviewing an abuse of discretion standard, that you're going to be able to look at it and say, no, no, there's nothing substantial here. And I think this would be a difficult case to infer anything widespread from the Fifth Circuit's practice. Just to put some context into the substantial process that was allowed here, Petitioner filed a 70-page opening brief. The State filed a 37-page response brief, and Petitioner filed and moved to file a 35-page reply brief. And so this was also the third time that the Fifth Circuit had seen this case. Robertson, I guess my question kind of cuts the other way. I'm saying they go through, yes, and you make the point. There was a substantial amount of process. There was a long consideration. There was a lot of briefing. I would have thought the purpose of a certificate of appealability would be to make the decision to move forward without all that elaborate process. Well, and the Fifth Circuit on occasion hears oral argument in considering whether to grant a COA in the capital posture insofar as the court would provide or believe that that is not the type of process that should be afforded at the COA stage in congruence with AEDPA. The court would hear oral argument on whether to grant a COA? The Fifth Circuit, on occasion, this is page 50 and 51 of our Respondent's brief, will hear oral argument in capital cases. Kagan in Mr. Keller, you know, some of the statistics that Petitioner has pointed us to, in capital cases a COA is denied in 60 percent of Fifth Circuit cases as compared to 6 percent of Eleventh Circuit cases, two roughly similar circuits where COAs are denied in capital cases ten times more in the Fifth Circuit. I mean, it does suggest that one of these two circuits is doing something wrong. And the Court has said that the COA should serve a gatekeeping function. The Court has also noted that death is different. And at the same time, the Fifth Circuit is providing substantial process. Now, insofar, though, as this Court were to – if it were going to conclude in this case that a COA should have issued, it – any such decision, I think, would be limited to the unique facts of this case. And I don't think there's anything that could be drawn about the Fifth Circuit's wider practice in denying or granting COAs, particularly in the capital posture, when substantial process is being afforded. This is not a situation where the Fifth Circuit is simply ignoring these cases and ignoring these claims. Quite the opposite. Robertson, is your suggestion that they deny more because they've taken a more searching look at the merits than the other circuits? I think it – insofar as the statistics could be shown, there is, in fact, a different denial-and-grant rate. I think the level of process that the Fifth Circuit is receiving in – in the quantum of argument may be going to those statistics, because the Fifth Circuit is not simply ignoring these claims, even here. But this is the whole point, really. They're not supposed to be doing what you would do when you decide an appeal. I mean, they actually don't have jurisdiction to decide the appeal. I mean, they're supposed to be performing a gatekeeping function, not deciding the merits of the case.  It – it – it correctly articulated the COA standard, and it examined the 11 facts that Petitioner alleged as a basis for ruling on the 6dB motion. Now, five of those were essentially the underlying ineffective assistance claim. And if the Fifth Circuit has not admitted to that, it doesn't say anything to the Fifth Circuit that three State court judges, two of their colleagues on the Fifth Circuit, two justices of this Court, have said or found Mr. Buck's case debatable, because that's a standard. It's debatable. They're – they don't pause and say, you know, people are – have some basis for an argument here. This is not frivolous. This is a serious question. It is – and the Fifth Circuit took these arguments seriously, and this is our Respondent's view. Sotomayor, that's not the issue. They're supposed to decide whether to grant the COA or not on whether the questions are serious or not, debatable, not decide the merits. I know it can appear a fine line in some situations, but how do you justify saying that this is not debatable? Here, the issue would be, could reasonable jurists debate whether the district court abused its discretion in finding extraordinary circumstances? And so while the reasonable jurist standard is lower, that's balanced, though, against the more deferential abusive discretion standard and the heightened extraordinary circumstances standard that this Court has noted will rarely be met in the habeas context. In our brief, we present a few examples of courts finding extraordinary circumstances. That would be when counsel wholly abandons a Petitioner, or a prison guard actively thwarts a Petitioner filing a habeas petition. Now, we don't mean to suggest those are the only instances in which that can give rise to. Ginsburg. Were there extraordinary circumstances in the other cases, in the other five cases? In the other five cases in which the State confessed error? Yes. Well, there, we would admit that since the prosecution was the one that was eliciting the race-based testimony, that that would go to a due process and equal protection violation, and that would be an extraordinary circumstance, but the Court would never reach that. But you said that that's because those that's more prejudicial when the prosecution introduces this? Is that what you said to Justice Ginsburg? Yes. That's your basic theory? The State is using it as an aggravator. Yeah. But and that that makes it more prejudicial. That's your basic theory? Both points. The State is using it. Because I don't understand. I guess if there's both points, tell me what the other point is, because I guess I just don't understand that point, that it seems more prejudicial when the defense attorney uses it. I mean, prosecution, you know, the jury is sitting there, and it realizes that the prosecution has an interest in convicting a person and in getting a sentence that the prosecution wants. So everything is discounted a little bit. But when your own – when the defendant's own lawyer introduces this, the jury is going to say, well, it must be true. Even the defendant's lawyer thinks that this is true. So, you know, who am I to – to argue with that? It seems wildly more prejudicial to me when the defense attorney introduces it. Except it's not the case here that Quijano was only testifying about race. Quijano said that it would be unlikely that Petitioner would be a future danger. And so Quijano's ultimate conclusion and multiple other aspects of his testimony was favorable to Petitioner as Petitioner has conceded. And so in that circumstance, the prejudice would not be nearly as great as when the State is injecting race into a proceeding. Alitoso, I didn't think that your primary argument had to do with the relative prejudice of having it done by the prosecutor and the defense attorney. I thought your argument was that the State of Texas feels a certain – feels a special responsibility when one of its employees engages in this misconduct. And when the – when the evidence is introduced by the defendant's attorney, it's an ineffective assistance of counsel question, and it has to be adjudicated under the Strickland test. That's absolutely correct. And then when you look at the aggravating evidence of executing a mother in front of her children and laughing about it and saying that the mother, quote, got what she deserved, unquote, and when we put in evidence from ex-girlfriend this is a JA-127A, of repeatedly beating her and threatening her with a gun, all of those go to whether there would, in fact, be prejudice under the Sixth Amendment ineffective assistance. Yes. And the legal question here, right, is whether this ineffective assistance of counsel claim, which has never been heard by any court, is a strong one, and a strong one including that the ineffective assistance here is likely to be prejudicial, which it seems as though it's – it's more – it's far more likely to be prejudicial when the defense counsel doesn't. Justice Kagan, when the State is the one injecting race into a proceeding, that's using it as an aggravator. And if the court were to – People expect the State to use whatever aggravators it has at hand. Now, people don't expect the State to do something as improper as this, but – but people understand that not everything that the prosecution says about a defendant, you know, that people, that jurors should – should – should think about those claims seriously because the prosecution has interests of its own. But the defense counsel's interests are supposed to be with the defendant. I'm just repeating myself. If the defense counsel does it, I mean, you know, who is the jury to complain? Well, this Court, I don't believe, has ever recognized a situation in which a defense counsel's act could give rise to structural error or per se prejudice. And any such rule, I believe, would invite gamesmanship. Of course, the prejudice analysis can still be done, but to say that it would be per se prejudicial, I think it would have to be balanced against the aggravating evidence and in the context of Kihano testifying helpfully to Petitioner that there would be an unlikely event of it being a future danger. Roberts. What is the relationship between the ruling on prejudice with respect to ineffective assistance and the 60B analysis? I mean, do you agree that if we disagree with your submission on prejudice under Strickland that your 60B analysis kind of falls apart? I believe the underlying claim on the merits would be stronger and it would be a lot more extraordinary under 60B. It is a factor that could be considered in doing the extraordinary circumstances analysis, because if there were extraordinary circumstances that were going to justify relief from the judgment, that would be a factor in the totality of the circumstances the Court would be that could consider in doing that analysis. If there are no further questions, we'd ask the Court to affirm the judgment of the Fifth Circuit. Roberts. Thank you, counsel. Ms. Swerns, you have four minutes remaining. Swerns. This Court has long recognized that the integrity of the courts requires unceasing efforts to eradicate racial prejudice from our criminal justice system. That commitment is as urgent today as at any time in our nation's history. Dwayne Buck's case requires meaningful Federal review of his claim that his trial counsel knowingly introduced an expert opinion that he was more likely to commit criminal acts of violence in the future. A certificate of appealability should certainly issue. With respect to Texas's arguments, I want to begin by making clear that, first of all, this Court in Georgia v. McCollum did make clear, as I think Justice Sotomayor noted, that the equal protection concerns that are implicated by the introduction of race into the criminal justice system absolutely are triggered by defense counsel's conduct, and certainly that was a situation where defense counsel exercised peremptory challenges based on race. And in that circumstance, that was actually an exercise of peremptory challenges intended to benefit the client, right? They were trying to strategically gain advantage by using race-based peremptory challenges. Here we have trial counsel making an inexplicable decision to introduce a knowing and inexplicable decision to introduce race. This is certainly worse and more aggravating for Mr. Buck. I would also like to just be clear that the prosecution's reliance on Dr. Quijano's testimony here was real. This wasn't a circumstance where the prosecutor was required to follow up on Dr. Quijano's opinion and reiterated on cross-examination, and then go further and argue in closing that the jury should rely on Dr. Quijano to find Mr. Buck likely to commit criminal acts of violence, and further argue that the jury should disregard the aspects of Dr. Quijano's opinion that conflicted with a finding of future dangerousness. When Texas did its review of death row after a conceded error in Saldana, it looked through all of the cases on death row to see what else was contaminated by Dr. Quijano's race as criminal violence opinion. And one of the other cases it looked at and ruled out was the Anthony Graves case, which demonstrates the options that were available to this prosecutor under these circumstances. In the Anthony Graves case, Dr. Quijano was called as a defense witness, just like he was here. In the Anthony Graves case, the defense elicited Dr. Quijano's race as criminal violence opinion on direct examination, just as here. But the difference is, in the Graves case, the prosecutor did not reiterate it on direct examination and then, in closing, argued that the jury should disregard Dr. Quijano's opinion. The prosecutor here absolutely capitalized on trial counsel's error. There is just no question about that. They made a choice that, you know, they could have gone the Graves route, but this prosecutor chose to go through the door that was open to Dr. Quijano's race as criminal violence opinion. Counsel for Texas also notes that the last note that the jury sent out was a request to review the crime scene video, which is absolutely true. But it means that the last two notes that this jury looked at, the two things that they asked for, right, was the expert's report, so we now have the race, and then we have the crime. This is exactly the crime that trigger this racialized fear of violence and raise the real risk of an arbitrary death sentencing decision. And then you have the report, which compounds that risk because it gives a defense expert scientific imprimatur to that pernicious group-based stereotype. So that further – is further evidence of prejudice to Mr. Buck. Last, I would just be clear that when Mr. Buck litigated his first 60B motion, Coleman, as Texas has acknowledged, stood as an unqualified bar. There was no opportunity before Martinez was announced for him to argue. Thank you. Roberts. Thank you, counsel. The case is submitted.